IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| HILLMAR PATTERSON, JR., | : |
| | : |
|    Plaintiff, | : |
| | : |
| vs. | : Civil Action File No. |
| | : **7:08-CV-3 (HL)** |
| VIRGINIA WILLIAMS, | : |
| JOHN RICHARDS, and | : |
| DR. BROWN, | : |
| | : |
|    Defendants. | : |
| | : |

**RECOMMENDATION**

Presently pending in the *pro se* prisoner 42 U.S.C. § 1983 action is a motion for summary judgment filed by defendants Virginia Williams and John Richards (doc. 29), and a motion for summary judgment filed by Dr. Brown (doc. 40).

Patterson is a former inmate that was incarcerated at the Thomas County Jail ("the Jail") from May 16, 2007, until June 24, 2008. Defendants are all officials who worked at the Jail during the relevant time. According to Patterson's verified complaint, on May 17, 2007, he advised Sonja Bradley ("Bradley"), who is medical officer at the Jail but not a defendant herein, that he needed to take medication for high blood pressure. (Doc. 2, p. 9). Patterson asked Bradley to check with the Thomas County Health Department and a local pharmacy to determine the medications he needed.. Patterson alleges that request was ignored by Bradley. Plaintiff alleges he went five days without any medication for his high blood pressure and hypertension (Id.).

Dr. Roland Brown ("Dr. Brown") is a physician that performs examinations and medical

treatment for inmates at the Jail. (Bradley Aff., ¶ 14). During the months of June and July 2007, Patterson alleges that he asked Dr. Brown to perform blood work to treat his high blood pressure. (Doc. 2, p. 9). According to Patterson, Dr. Brown refused to perform blood work. (Doc. 2, p. 9). On August 17, 2007, Patterson alleges that he jammed his finger. (Doc. 2, p. 13). That same day, Patterson alleges that he was examined by Dr. Brown, and he complained to Dr. Brown that his finger was swollen and in pain. According to Patterson, Dr. Brown advised him to allow his finger to heal but otherwise, Dr. Brown stated he could not treat the finger. (Id.). During the month of September, 2007, Patterson alleges that he complained to Dr. Brown again that his finger was in pain.  Dr. Brown advised Patterson that he could take ibuprofen but otherwise, there was nothing he could do for his finger. (Id.). During the month of October, 2007, Patterson alleges that he complained to Dr. Brown that his finger was in pain and asked for an x-ray which was not recommended by Dr. Brown. (Id., pp. 4, 13).

During the month of November, 2007, Patterson complained to Sonja Bradley that his finger was still swollen and in pain and that Dr. Brown should have ordered an x-ray. (Doc. 2, p. 4). Bradley told Patterson that he could write an administrative grievance about his opinion that he needed an x-ray. (Id.).  On November 10, 2007, Patterson wrote an administrative grievance that stated his finger was in pain and in need of treatment different from the treatment he had received from Dr. Brown. (Id., pp. 4-5). On November 24, 2007, Patterson met with Vanessa Fann, who is a grievance officer at the Jail, and he complained that his finger was still in pain. (Id., p. 5).

On November 27, 2007, Patterson met with defendant Virginia Williams ("Williams"), who is the chief jailer at the Jail, and complained that his finger was still in pain and that Dr. Brown

should have ordered an x-ray. (Id., p. 5). Patterson told Williams that he had come to her to find someone with authority to resolve his complaints about the proper medical treatment for his finger. (Id., p. 7). Plaintiff alleges that Williams never helped him, and interfered with his ability to file a grievance about the issue with his finger.

Patterson has also named Captain John Richards ("Richards"), who is the jail administrator, as a defendant in the above-styled case; plaintiff alleges that Vanessa Fann forwarded to Richards a grievance about inadequate medical treatment signed by Patterson and 39 witnesses. (Doc. 2, p. 11). According to Patterson, no changes in medical treatment were made at the Jail in response to that grievance. (Id.).

Defendants have submitted an affidavit from Sonja Bradley regarding the medical treatment that Patterson received while he was incarcerated at the Jail. (Doc. 31, Bradley Aff., ¶¶ 1 - 45). That affidavit demonstrates as follows. On May 16, 2007, Patterson was booked into the Jail. (Id., ¶ 10). On May 17, 2007, Patterson signed a authorization for release of his medical records from the Thomas County Health Department, John D. Archbold Memorial Hospital and Thomas County Primary Care. (Id., ¶ 11). Responses to the request were made and received on May 21, 2007. (Id.). On that same day, Bradley reviewed the responses and the Jail's internal medical records regarding Patterson that were generated during his previous incarcerations periods. (Id., ¶ 15).

Before Patterson's first visit to Dr. Brown, medication for high blood pressure was delivered to the Jail from a family member of Patterson; however, that medication had expired and, therefore, Patterson was scheduled to visit Dr. Brown. (Id., ¶ 14). On May 21, 2007, Patterson was examined by Bradley and Dr. Brown. (Id., ¶ 15). Bradley took Patterson's vital signs which

were good. (Id.). Dr. Brown noted that Patterson had a history of hypertension, thrombocytosis and acid reflux disease. (Id.). Following the examination, Dr. Brown prescribed aspirin, Maxzide (a.k.a. Triamterene), and Lisinopril, which are used to treat hypertension and high blood pressure, and Prilosec, which is used to treat acid reflux disease. (Id., ¶ 16).

On June 19, 2007, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 17). On that same day, Patterson was examined by Bradley and Dr. Brown. (Id.). Bradley took Patterson's vital signs which were good. (Id.). Following examination, Dr. Brown prescribed refills of Maxzide, Lisinopril, and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id., ¶ 18). On July 19, 2007, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 19). Patterson also complained that the Prilosec prescribed by Dr. Brown was ineffective against his acid reflux. (Id.). On that same day, Bradley and Dr. Brown examined Patterson. (Id.). Bradley took Patterson's vital signs which were good. (Id.). Following examination, Dr. Brown noted that Patterson's hypertension and blood pressure were under control. (Id., ¶ 20). Dr. Brown prescribed refills of aspirin, Maxzide, Lisinopril, and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id.). Dr. Brown doubled Patterson's dosage of Prilosec as a result of his complaints that the current dosage was not effective. (Id.).

On August 17, 2007, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 21). On that same day, Patterson was examined by Bradley and Dr. Brown. (Id.). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson complained that he had been poked in

4

the eye. (Id., ¶ 22). Dr. Brown examined Patterson's eye, and he noted redness caused by a ruptured blood vessel. (Id.). Following his examination, Dr. Brown ordered Patterson to use Neosporin ophthalmic ointment and prescribed antibiotics. (Id.). Dr. Brown also prescribed refills of aspirin,
Maxzide, Lisinopril, and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id.).

On September 14, 2007, Patterson asked to be examined by Dr. Brown. (Id., ¶ 24). On that same day, Patterson was examined by Bradley and Dr. Brown. (Id.). Bradley took Patterson's vital signs which were normal with the exception of an elevated pulse. (Id.). During Dr. Brown's examination, Patterson complained of sinus problems and dizzy spells. (Id., ¶ 24). Patterson also complained that he jammed his finger about a month before and that it was swollen and sore. (Id.). To treat Patterson's complaint of sinus problems, Dr. Brown examined Patterson's throat and found that it was slightly red. (Id., ¶ 25). Dr. Brown also felt Patterson's lymph nodes and found that they were normal. (Id.). To treat Patterson's complaint about his finger, Dr. Brown examined his finger and noted that it was swollen and that flexion of the finger caused pain. (Id., ¶ 26). Dr. Brown diagnosed Patterson with a finger sprain. (Id.). Following his examination, Dr. Brown prescribed Naproxen for pain. (Id.). To treat Patterson's complains about dizzy spells, Dr. Brown tested Patterson's To treat Patterson's complains about dizzy spells, Dr. Brown tested Patterson's pulse which had returned to normal. (Id., ¶ 27). Dr. Brown noted that Patterson could get up from a chair. (Id.). Dr. Brown diagnosed Patterson with either orthostatic hypertension, which is commonly called a head rush, or vertigo. (Id.). Following his examination, Dr. Brown prescribed Meclizine for dizziness. (Id.).

On October 18, 2007, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 28). The next day, Patterson was examined by Bradley and Dr. Brown. (Id., ¶ 29). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson complained that his finger was still in pain. (Id., ¶ 30). Following his examination, Dr. Brown noted that Patterson's finger was swollen but that it was not red or tender, and he ordered Patterson to take ibuprofen for pain. (Id.). Dr. Brown also noted that Patterson's blood pressure and hypertension were under control. (Id.). Patterson prescribed refills of Triamterene and Lisinopril for continued treatment of Patterson's hypertension and high blood pressure. On October 26, 2007, Dr. Brown prescribed a refill of Prilosec for continued treatment of acid reflux. (Id., ¶ 31).

On November 16, 2007, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 32). On that same day, Bradley and Dr. Brown examined Patterson. (Id.). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson did not complain of any new problems. (Id.). Dr. Brown prescribed refills of aspirin, Triamterene, Lisinopril and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id.).

On December 17, 2007, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 33). On that same day, Bradley and Dr. Brown examined Patterson. (Id.). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson did not complain of any new problems. (Id.). Following his examination, Dr. Brown prescribed refills of aspirin, Triamterene, Lisinopril and Prilosec for continued treatment of Patterson's hypertension, high blood pressure, and acid

reflux. (Id.).

On January 17, 2008, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 34). On that same day, Bradley and Dr. Brown examined Patterson. (Id.). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson complained of problems with his vision. (Id., ¶ 35). To treat that complaint, Dr. Brown examined Patterson's eyes. (Id.). Based on his examination, Dr. Brown diagnosed Patterson as near sighted. (Id.). Following his examination, Dr. Brown prescribed refills of aspirin, Triamterene, Lisinopril and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id., ¶ 36).

On February 15, 2008, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 37). On that same day, Bradley and Dr. Brown examined Patterson. (Id.). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson did not complain of any new problems. (Id.). Following his examination, Dr. Brown prescribed refills of aspirin, Triamterene, Lisinopril and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id.).

On March 18, 2008, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 38). On that same day, Patterson was examined by Bradley and Dr. Brown. (Id.). During Dr. Brown's examination, Patterson complained that he had experienced discomfort when urinating for the past two weeks. (Id.). Dr. Brown noted that Patterson did not have any history of bladder or kidney disease. (Id.). To treat Patterson's complaint, Dr. Brown ordered a urinalysis. (Id., ¶ 39). The urinalysis results showed

no blood or bacteria present; however, Dr. Brown prescribed an antibiotic to guard against any possible infection. (Id.). Dr. Brown also ordered Patterson to drink plenty of fluids and to follow up with him as needed. (Id.). Following his examination, Dr. Brown also prescribed refills of aspirin, Triamterene, Lisinopril and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id.).

On April 18, 2008, Patterson asked to be examined by Dr. Brown and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 40). On that same day, Bradley and Dr. Brown examined Patterson. (Id.). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson did not complain of any new problems. (Id.). Following his examination, Dr. Brown prescribed refills of Triamterene, Lisinopril and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id.).

On May 14, 2008, Patterson asked to be examined by Dr. Brown, and for refills of his medication for hypertension and high blood pressure. (Id., ¶ 41). On that same day, Bradley and Dr. Brown examined Patterson. (Id.). Bradley took Patterson's vital signs which were good. (Id.). During Dr. Brown's examination, Patterson complained that his throat had been in pain since he arrived at the Jail. (Id., ¶ 42). Patterson also complained that his eyes bothered him. (Id.). To treat Patterson's complaint about throat pain, Dr. Brown examined Patterson's throat and felt his lymph nodes and found no problems. (Id., ¶ 43). To treat Patterson's complaint about his eyes, Patterson was given a visual acuity test with a standard eye chart. (Id., ¶ 44). As a result of that test, Dr. Brown determined that Patterson was slightly near sighted. (Id.). Patterson had a pair of prescription eye glasses available to him at the Jail that he had brought from home. (Id.). Dr. Brown advised Patterson that he should wear those glasses but that Patterson's eyes did not

require immediate treatment. (Id.). Following his examination, Dr. Brown prescribed refills of Triamterene, Lisinopril and Prilosec for continued treatment of Patterson's hypertension, high blood pressure and acid reflux. (Id., ¶ 45).

On June 24, 2008, Patterson was transferred from the Jail to Coastal State Prison. (Id., ¶ 46).

*Summary Judgment Standard*

In determining a summary judgment motion, the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235 (11th Cir. 1992)(citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). However, once the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When the nonmoving party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the nonmoving party's claim, or by pointing to specific portions of the record which demonstrate that the nonmoving party cannot meet its burden of proof at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-608 (11th Cir. 1991).

The existence of material disputed facts will not defeat summary judgment in favor of a public official, however, when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [plaintiff's] case, and on which [plaintiff] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).   Facts in dispute cease to be "material" facts when the plaintiff fails to

establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

It is well established that prison personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97 (1976). However, "[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations." It must involve the "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 509 U.S. 25 (1993). Knowledge of the medical need alleged or circumstances clearly indicating the existence of such need is essential to a finding of deliberate indifference. Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1191 (11th Cir. 1994), quoting Horn ex rel. Parks v. Madison Co. Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994), cert. denied, 513 U.S. 873 (1994). In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. "It is......true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." McElligott v. Foley, 182 F.3d 1248, 1256-1257 (11th

Cir. 1999).

A medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir.1994) (quotation marks and citation omitted).    To demonstrate "significant" harm, a plaintiff must provide verifying medical evidence that proves that it was the denial or delay in medical treatment that caused the harm rather than an underlying condition or injury.  Hill, 40 F.3d at 1186;   Harris,  21 F.3d at 393-94 (11th Cir.1994).   The medical care provided to an inmate must be reasonable.  Patterson v. Riddle, 407 F. Supp. 1035 (E.D. Va. 1976). However, "it is not required that the medical care provided to the inmate be perfect, the best obtainable, or even very good." Estelle, 429 U.S. at 106. *See also* Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991); Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980); Hawley v. Evans, 716 F. Supp. 601, 603 (N.D. Ga.1989).

The Eleventh Circuit has noted that, "where a prisoner has received medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." Murphy v. Turpin, 159 Fed. Appx. 945 at fn. 4, (11th Cir. 2005),  citing Hamm, 774 F.2d at 1575. "Thus, where an inmate receives medical care, but desires a different mode of treatment, the care provided does not amount to deliberate indifference." Id.

In Estelle v. Gamble, supra, the Supreme Court cautioned, however, that not every allegation of inadequate medical treatment states a constitutional violation. Estelle at 105.  Mere negligence in diagnosing or treating a medical condition is an insufficient basis for grounding

11

liability on a claim of medical mistreatment under the Eighth Amendment. *Id.* at 106 (stating "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"). A Section 1983 claim, therefore, "does not lie if a prisoner's complaint is directed at the wisdom or quality of the medical treatment he received in prison, even if that treatment is so negligent as to amount to medical malpractice." Brinton v. Gaffney, 554 F.Supp. 388, 389 (E.D.Pa.1983); see Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.1991).

"The question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court." Estelle, supra, at 107.

While plaintiff's original complaint was verified, none of his responses to the motions for summary judgment are verified or otherwise sworn testimony.

### 1. Dr. Brown

#### a. High Blood Pressure/Hypertension

Plaintiff alleges in his responses to the motion for summary judgment (docs. 39, 47) that he does not dispute the received the correct medication for these illnesses, but that he should have received a blood test to monitor his vital organs because high blood pressure could cause damage. Plaintiff also claims that the five days he went without any medication for his ailments put his life at risk. However, plaintiff does not allege that he suffered any injury as a result of either the delay or the failure to give him a blood test.

Furthermore, the affidavit by defendant Dr. Brown (doc. 43) show that plaintiff's high blood pressure and hypertension was well controlled throughout plaintiff's stay at the Jail. It is clear

that plaintiff received routine, regular treatment for his high blood pressure and hypertension that included monitoring and prescribed medication. Clearly, this does not arise to deliberate indifference.

### b. *Thrombocytosis*

Plaintiff contends he never received any medical care for his thrombocytosis. Plaintiff states that he was told after his transfer to Coastal State Prison that it is very important for him to take an aspirin every day and to know his platelet count. When plaintiff was transferred to Coastal State Prison, he was given a blood test on June 24, 2008, which proved that plaintiff had a very high platelet count. Plaintiff was also referred for a bone marrow biopsy (Doc. 47, Exhibit pg. 34).

Plaintiff states that he spoke with Dr. Brown about his condition and the need for blood work, but that Dr. Brown refused, and stated that the Jail did not do blood work, that if plaintiff wanted that he could have gotten it by staying out of Jail.

However, plaintiff does not allege any actual harm that resulted from Dr. Brown's refusal to conduct a blood test for plaintiff. While plaintiff did apparently have elevated platelet levels when he was tested at Coastal State Prison, plaintiff again has not provided any evidence that it was the delay in receiving the blood test rather than the actual illness that caused him harm. Fear that he could have suffered a stroke or heart attack, without more, does not turn this into a constitutional violation. At best, plaintiff has stated a claim for medical negligence, which clearly does not constitute deliberate indifference. Estelle, supra, at 107.

### c. *Acid Reflux*

Plaintiff claims that he received the wrong medication for his acid reflux, and that

defendants have perjured themselves by claiming he received the correct medication.  Plaintiff claims that the generic drug he was given was not effective for his symptoms, and that he requested something different, but that he did not request any specific drug in particular.  The generic drug plaintiff was given was Omeprazole.  According to the Physicians' Desk Reference (Doc. 48  Exhibit A), the drug is the generic equivalent of Prilosec.

Plaintiff states that after 11 months of complaining that the medication was not working, he was finally prescribed Prevacid in May of 2008.  This issue presents a classic example of a disagreement with a course of treatment that sounds in state tort law; however, it is not enough to show deliberate indifference as plaintiff received medication for acid reflux, which was increased when it appeared it was not working, and then changed to another drug.  That it did not happen quickly enough to suit plaintiff does not give rise to a constitutional violation.

*d. Eyes*

Plaintiff contends that he continued to have eye problems throughout his stay at the Jail, but that he was told he would have to wait until he was transferred to the Department of Corrections to receive new glasses.  Dr. Brown gave plaintiff eye exams and determined that plaintiff was near sighted.  (Doc. 43).  Dr. Brown advised plaintiff to continue wearing the glasses he had. (Doc.43)

Plaintiff claims that he should have been given new glasses.  Again, while plaintiff certainly would have preferred new glasses, there is no evidence to show a deliberate indifference to a serious medical need.  Even assuming without deciding that needing a change in a pair of prescription glasses arises to a serious medical need, plaintiff has not presented any evidence that it was the delay in receiving new glasses that caused him any harm rather than the underlying

condition as is required under Hill, supra, and its progeny.

### e. Finger

Plaintiff contends that he never received any treatment for his jammed finger, that it remained swollen and painful for three months, yet he only received pain medication for 21 days, never had an x-ray or received a splint for his finger. Plaintiff states that the length of time he was in pain leads him to conclude that his finger had to be broken, and it should have been x-rayed and splinted.

Plaintiff states that an x-ray taken of his finger after his transfer into the Department of Corrections on September 23, 2008 and examination by a doctor showed that his finger was actually broken, and it might have to be re-broken and set because it was such a long time since the injury.

However, plaintiff submits the report from the x-ray (doc. 59, Exh. B) dated September 24, 2008, which states as the findings: "Moderate OA of the DIP joints of the right 4th and 5th digits is noted with mild soft tissue swelling. No acute fracture or dislocation is noted." This does not support his statement that his finger was broken. Instead, plaintiff appears to have moderate osteoarthritis in two joints.

Again, plaintiff disagrees with the treatment he received for his jammed or sprained finger. The evidence submitted by plaintiff does not support his contention that the delay in receiving treatment caused him significant harm. This claim sounds in tort law, and does not arise to a constitutional violation.

"[M]ere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment claim." Estelle, 429 U.S. at 846.

*2. Williams and Richards*

Plaintiff alleges that defendants Williams and Richards should have intervened in his complaints about needing an x-ray for his finger.  However, because the undersigned has determined above that the failure to order an x-ray for plaintiff did not amount to deliberate indifference to a serious medical need in violation of the constitution, it necessarily follows that neither Williams or Richards demonstrated deliberate indifference to plaintiff's serious medical needs.

The undersigned consequently finds that all defendants are entitled to summary judgment, and that their motions for summary judgment should be **GRANTED**.  Pursuant to 28 U.S.C. § 636(b)(1), the parties may file written objections to this recommendation with the Honorable Hugh Lawson, United States District Judge, WITHIN TEN (10) DAYS of receipt thereof.

**SO RECOMMENDED**, this 20th day of February, 2009.

                                                     //S Richard L. Hodge  
                                                   RICHARD L. HODGE  
                                                   UNITED STATES MAGISTRATE JUDGE

msd